May it please the Court, I'm Neal McCabe and I represent the O'Quinn Law Firm, the actual successor to a number of law firms named in this suit as defendant. This is a dispute between two law firms. It's not a dispute between a client and a lawyer, but it is a fee dispute. The issue, as it appears to us in this case, is whether the contract between two law firms written by the opposing law firm here today, Brown & Bain, necessarily means that the hired hand on a job, which we would call Brown & Bain, gets a bonus at the end of the job, even though it walked off the job nearly three years before the job was done, and even though the boss, that would be my law firm, lost money on the job. Well, you could have put that in the contract if you wanted that result to be. And don't think I did. And it wasn't in the contract. That's true. It wasn't in the contract. And we're here to argue about the words of the contract, but how those words of the contract must have been understood by the parties when they entered into them. And it's our position that the firm being hired couldn't possibly have thought that the contract, even though they wrote it, was actually providing that they would get a bonus of $3 million even though we lost $3 million on the case. Have you got the excerpt for record? Yes, Your Honor. If you look at 49, you have, with some of the expenses, and they're somewhat opaque. Do they include any fees to lawyers? Your Honor, it's possible that they do. Well, answer yes or no. Well, Your Honor, I can't tell you for sure. Well, look at it and tell me. Well, Allen and Price was the law firm, right? Yes, Your Honor. Brown and Bain was the law firm. Cohen and Kennedy was the law firm. Yes. Peter Osetek was the law firm. So you've charged all the lawyers as expenses. Is that correct? That's what it appears from what you have in the record, Your Honor. Well, and how about the charge for the Phoenix office? Office salaries, Phoenix, $4 million plus. Yes, Your Honor. Who got those salaries? That was for a bunch of paralegals for the most part, Your Honor, and, of course, the renting of the building, that sort of thing, special office. And, of course, what? Renting of the actual building, the actual office space. And it ran up to $4 million for paralegals? That's what the record indicates, yes, Your Honor. Does it include lawyers? No, Your Honor, I don't believe it has lawyers involved in that one. That's paralegals, I believe. And then you have a separate thing for office expense. That's another $2 million. Yes, Your Honor. That's the office rent, isn't it? Yes, Your Honor. So the 4 plus is just for paralegals? And I assume, Your Honor, other expenses connected to the actual running of that office. What do you mean? You have office expenses, $1.9 million. That's clear. Then you have this other item, utterly unexplained and somewhat unbelievable as what paralegals could run up. How much did you pay them? Your Honor, I don't have that in the record. No. Well, some figure that what B&B paid for their paralegals. It's a very slight demonstration of what your expenses were. I agree, Your Honor, but I also would have to say that the issue of the legitimacy of the expenses is not before the court and was not decided on by the district court in this case. It may, of course, become an issue if the court were to remand the case to the district court. It's not an issue that is done anything within the briefs by either side, except Brown and Bain does somewhat insinuate that the expenses may not be legitimate, but does not argue that. But, Counsel, in response to Judge Noonan's question as to whether any of these expenses included payments to law firms, you said you didn't know. Your Honor, I know. You didn't know that Allen & Price was a law firm? Your Honor, I know nothing. I did. I know nothing other than what the record itself shows there. I don't bring any particular knowledge of my own to this case. But we have letterhead from Allen & Price telling you that they would break off from Brown & Bain and that they would be happy to help you out on this case. We knew that they were a law firm from the record that's here, Counsel. Yes, Your Honor, and I'm not disputing what the record says and whether a law firm as stated in the record is a law firm. And you knew Brown & Bain was a law firm? Certainly. But you answered that you didn't know. No, Your Honor, if that's what you heard me say, then I must have misstated. I certainly know that Brown & Bain, the opposing counsel in this case, is a law firm. But again, this case is not postured so that the legitimacy of any of these expenses is before this Court. This is a question about the interpretation of a contract, basically whether we were covered in the case or not. Well, your whole argument is, you had all these expenses, and then it turns out a good, a fairly large portion of them appear to be expenses for lawyers. It's very much goes to the heart of your case. Not unless that was an issue actually contested and ruled on by the district court. Well, no, no, no. We can affirm on any ground in the record. Well, Your Honor, that issue was not put before the Court. It's not a basis of the summary judgment. It could not possibly have been a basis of the summary judgment in this case. And the Court sure can affirm on any ground it could have been a basis, but it could not have been. That question was put aside. The whole legitimacy of any particular expense was not a basis of the summary judgment. Well, the question is, have you established all these expenses? You say you have. We look at the record, and you haven't. The question is not, I beg to differ, whether we have established the legitimacy of expenses. That is not actually being contested by Brown and Bain. Brown and Bain has made the point that under the contract, they simply are entitled to another $3 million because, under their view of the case, our law firm recovered in a settlement. Our position is we didn't recover. We actually lost $3 million. But your law firm didn't recover. The recovery was the total recovery from Motorola. I couldn't hear the last part, Your Honor. The total recovery from Motorola was at issue, not the recovery to your law firm. It's from the person your law firm sued. I have to differ with the Court on that because the way the language of the contract reads, it keys on the recovery by the attorneys, not the recovery by the clients. And so the only thing at issue would be how much did the O'Quinn Law Firm and any other lawyers associated with it get. Why didn't you use some term like net recovery or profits instead of the gross term recovery? If I had written the contract, Your Honor, I would have, but I was not involved. But your client signed the contract. Yes, Your Honor. And they're good lawyers. Your client is good lawyers? Could I ask you another question? Why did you not – why didn't you file a refi brief? Your Honor, I didn't see that the arguments being advanced by Brown and Bain did anything other than reiterate. You thought you said it all in the opening brief. It's very unusual, very, not to have a refi brief. It's a – well. You know, I've seen a lot of contingency fee agreements over the years. I've never heard the term recovery mean anything but the gross amount. And when people mean net amount, they usually provide for expenses and so forth. And I realize this is somewhat different because it's a fee-sharing arrangement. But I've just – you don't have a case, and I've never seen an interpretation like this before. I mean, it's Hollywood accounting, it appears to be. I agree that – I agree there's not a case on point. And if I only had a case, then I'd be very happy up here. The other side doesn't have a case on point either. And the difference between what Your Honor is talking about and what we have here is that this is not a contingency fee agreement between a client and a lawyer. Here we have an agreement written essentially by the other side, true, signed by a lawyer from our firm. And I must say that the lawyer for whom I work, Mr. O'Quinn, is a very good lawyer. If I had written this contract, it would look very different. But I think there is ambiguity in the contract. It's not clear what's meant by the term recovery. It talks about recovery, and it talks about the proceeds of the litigation. Counsel, how much – how much did the class recover from Motorola? Well, I have to, for once, say it's not a class, Your Honor, not to be pedantic, but it was – those were individual tort actions. Okay. But you had roughly what, 900? Approximately 900, yes, Your Honor. Okay. Okay. Of the 900 – for the 900 plaintiffs, then, not class, how much – how much did they recover? How much did they recover? Unfortunately, approximately $3 million. Okay. When – now, the gross payout was something in the excess of 26 million, is that correct? Yes, Your Honor. Okay. Of that, of the 26 million, 3 million actually went to the clients? Yes. Okay. Does the – does the O'Quinn law firm have a website? Yes. Okay. On that website, do you recount the history of triumphs that you've had for your clients? I don't recall that, Your Honor. Okay. Is there any evidence in the record that the – that the O'Quinn law firm ever issued a press release or anything else in connection with the settlement? I don't recall that, Your Honor. Okay. Did – do you know whether the newspapers reported it? No, Your Honor, and this was all before my time at the firm. Okay. I don't have a recollection. The reason I ask that question, counsel, is that I think that the – in the ordinary course, that a law firm that obtained in gross a $26 million settlement from Motorola would have advertised it as a $26 million recovery from Motorola and not a $3 million recovery on behalf of the clients. I think that's the way that the newspapers would ordinarily record it. So that in our ordinary conversation, and you recovered $26 million from Motorola, and that's what you're going to tell people, that you recovered from Motorola. I get your point, Your Honor. I don't know that we did that in this case, and therefore – I'm wondering whether the – whether your client is that careful in the parsing of words on the website and in press releases and so on as they have been in the briefs here today. That's a good question. I just don't know the answer to it. I'd have to go back and look at the website. I don't recall this case being a case that the firm bragged about. Not when you lose $3 million. I mean, you can always make a public statement designed to enhance your reputation, but in the bench and bar, we all know what happened in the case. And Mr. O'Quinn and the law firm doesn't go around saying we won a bunch of money in the Motorola case because we lost $3 million. And our point is that when we lose $3 million, the attorneys that we hired should not think that they're going to get a bonus. If I worked on this case, I didn't. I was still in academia then, nice and tenured and keeping quiet. But if I were working on the case, I wouldn't expect a bonus. If this were a quantum merit case, your argument would have force. But it's a contract case. Yes, it is. And so we just have to look at the words of the contract and see what they mean. You do raise an argument that because they stopped working on the case, they shouldn't be entitled to it irrespective of the contract language. Do you want to address that? Your Honor, we got an opinion from Professor Hazard. The trial judge rejected it, though. But I think he's right. I think the laws of ethics for lawyers support what we say. That is that when an attorney walks away from a case, not only does he forfeit any contingency fee, but he has to give back. You know, you haven't stated the law correctly. The law, as Professor Hazard puts it, is if a lawyer walks away from a case and it imposes a burden on its client. Now, did you show any burden on the client as a result of B&B withdrawing? The burden would be to go and get a counsel, which we did. What was the amount of it? Just that, Your Honor, that one has to go and find other local counsel. We couldn't prosecute a case by ourselves. That's a burden. Well, pretty thin. Well, that's his opinion, too, though, that that was unethical to walk away. It's not my main argument today, but certainly I think it colors the argument about the contract. That is, one should not expect a bonus when one's walked away from the job. Counsel, the lawyers at Allen and Price were apparently former Brown and Vane attorneys who then broke off and formed their own law firm. Had either of those attorneys had any affiliation with this case while they were at Brown and Vane? I may be mistaken about the lawyers, but I think that Mr. Ekstein was a lawyer at Brown and Vane before. Well, I believe the correspondence is either from Mr. Allen or Mr. Price, the principals there. And they note that they have just broken off from Brown and Vane and that they would welcome the opportunity of working on this case. And what I'm asking is, do you know whether either Mr. Allen or Mr. Price had anything to do with this case while they were attorneys at Brown and Vane? That I don't recollect, Your Honor. And that is not our main argument, that there was some big burden in getting other counsel. Your argument is that the term is ambiguous. There are other ambiguous terms, and you should have been allowed to produce extrinsic evidence to demonstrate the meaning of the terms, right? Yes, Your Honor. The contract says that if Brown and Vane is to get a bonus, then they are to get it from the proceeds of the litigation. Our view is that as far as O'Quinn firm is concerned, there were no proceeds of the litigation. Yes, there were listed $10 million in attorney's fees, but there were an additional over $13 million in expenses that we couldn't, we could not charge to the clients. Because if we did, there would be no money for the clients, and therefore, since there would be no money for the clients, there would be no settlement. We could have done nothing but try to proceed to trial, and under the changed law at the time, probably lose. Because as I think as the Court understands, right after this case started, we had the Daubert v. Merle Dow case come out, which started to impose different requirements for expert testimony, really went to the causation element in this case. The idea that you can prove TCE as a contaminant caused illnesses and so on became more or less untenable under the science that we had at the time. The Arizona Supreme Court followed up with that five years later in a case in which the Arizona Court of Appeals, in which the Arizona Court really actually excoriated three of our experts who had appeared in another case but were to appear in ours. And so it was clear, the handwriting on the wall, that we were going to have a difficult if not impossible time to prove causation, even though it's $26 million into the expenses. That's when Brown v. Merle decided to walk off the case. Look at the size on the prior of the information we got yourself, but we paid the money we  as they were going to pay for a case you were going to lose. I'm sorry, Your Honor, I didn't understand that. You want to save some time for rebuttal. We've got about a little over four minutes left. Yes. I said that at the beginning. But thank you for reminding me. I'll do that now. All right. Thank you. Thanks very much, Your Honor. May it please the Court. Lawrence Kasten for the appellee, Brown and Bain. I think when a party represents in an opening brief that it absorbed expenses or that it lost money on a case, which was one of the first things Mr. McCabe said, it is certainly a legitimate question whether those were recoverable expenses at all. On pages 24 to 26 of our answering brief, we issued a fairly direct challenge to O'Quinn to explain how it thought these were recoverable expenses in the first place. And they did something that's unique in my experience as an appellate lawyer. They didn't file a reply brief. I thought that was quite telling. And certainly I think it's permissible for this Court to look at O'Quinn's engagement letter with its own clients, to read the exclusions therein, and to conclude that at least there are reasons to be highly suspicious of whether these were reimbursable costs at all. Let me move directly to the contract interpretation issue. Judge Thomas, I think your understanding of the word recovery accords not only with my own, but also with O'Quinn's engagement letters with his own clients in this case. If you look at the excerpts of record, page 4, the word recovery is used in the exact same sense that it's used in the fee agreement with Brown and Bain. Specifically, it refers to the gross amount from which something is to be deducted for purposes of a calculation. In the engagement letters with the clients, the question, it talks about the plaintiff's recovery from which they will pay costs. And what O'Quinn is arguing in this Court is that recovery – Although, counsel, on page 4, it does say total recovery or settlement. So it does have an adjective there that's not found in your contract. That's true. Let me find the reference that I was talking about. That is true, Your Honor. It does say total recovery, but even with the adjective, it reinforces the proposition that recovery is not some netting principle. And if you go back to the Brown and Bain, O'Quinn fee arrangement, there's language in there that refers to the recovery exclusive of costs reimbursement. So plainly, what the parties are envisioning is there will be a recovery from which something may be excluded. If it were to be a netting concept, as Mr. McCabe has argued, you couldn't exclude anything from it. And I think as the Court noted in its questions to counsel, if the contract really meant what O'Quinn is asserting, there are any number of ways they could have said that. They could have said net profits. They could have referred to reimbursable expenses instead of a specific language that they chose. They said that recovery was exclusive of costs reimbursements, which are to come from plaintiff's share of the recovery. The – let me move to the withdrawal issue, because the Court raised it briefly, even though Mr. McCabe has said it's not his main argument and that it merely colors the other argument. Judge Thomas – I'm sorry, Judge Noonan, you were exactly correct about what the law is, and the Court would need to go no further than Professor Hazard's, their expert's, own treatise in the case. And this is in talking about restatement of the law governing lawyers, section 40. He, in his treatise, describes when a lawyer who's withdrawn from a case may be entitled to their contractual rate of recovery. And here's what he says. He says, And that's entirely what we have here. There is no evidence of burden in this case. As the Court's noted, the lawyers that had been working on the case had established their own office. It was an easy transition. So Allen and Price were working on this case while they were around in Bain? Mr. Price was. I can't say for certain about Mr. Allen, and I believe some of the cost records are in the record to establish that Mr. Price was working on the case. So the suggestion has been made that your firm withdrew because of adverse precedent that was established by the Arizona Court of Appeal. In other words, once the handwriting was on the wall, your firm withdrew because of that. How do you respond? I think Daubert was decided in 1993. I'm not talking about Daubert. I'm talking about the Arizona Court of Appeal decision. I think the record tells a much different and much more compelling story about why Brown and Bain withdrew. And the only evidence they've offered about withdrawal is not evidence at all. It's Professor Hazard's affidavit where he speculates about the timing. And he goes on in his affidavit to say, but of course I'm not a finder of fact. Here's what the actual evidence is. From 1993 until 1997, Brown and Bain is intimately involved in the case. They work thousands of hours, clean up hundreds of discovery requests, have arguments before the Arizona Supreme Court, make a tremendous contribution to the case, as O'Quinn has admitted in discovery in this very case. In 1997, an O'Quinn lawyer sends out a memo that says, I'm in charge now. I'm responsible for the day-to-day decisions. Brown and Bain's involvement in the case gets reduced. The communication to Brown and Bain gets reduced until the point in 1998 where O'Quinn goes so far as to separately negotiate with Motorola's counsel a case management order that imposed unreasonable deadlines on the parties to complete discovery. At that point, Brown and Bain is in an untenable position. Under the local rules of the District of Arizona, it's counsel of record and has responsibility for the case. Under the ethical rules, it has liability for the case. And so it's got no voice, no communication, and it's on the hook. So it doesn't do anything precipitous. It sends a memo, which is in the record, a letter to Brown and Bain and says, I'm sorry, to O'Quinn, and says, we think it's time we should step aside. We're just not being used in the case. For all their complaints about the withdrawal now, almost two and a half months go by, and O'Quinn never objects, never says, oh no, don't do that. You have to stay in the case. Says nothing. Makes a phone call where it asks for names of other local counsel in Arizona. It's only when the fee dispute comes up that this withdrawal is somehow thought to be nefarious. And in fact, Brown and Bain files their motion in the district court. District court lets them out, and there's no objection ever made. Two and a half months. What is this all relevant to anyway? Under the restatements of the law governing lawyers, section 40, it specifies three conditions in which the trial court may exercise its discretion, and the restatement makes it clear that this is a discretionary decision to award attorney's fees after a withdrawal. One of those is misconduct. Even if we accept it as true, their proffered reason for Brown and Bain's withdrawal, it wouldn't come close to rising to the level of misconduct that the restatement envisions. The comments talk about a breach of the duty of ethics, a series of errors that call the lawyer's competence into question. Let me tell you what Brown and what O'Quinn has admitted in this case. These are discovery requests in this case. They've admitted that at no time did the clients or O'Quinn ever question Brown and Bain's skill, commitment, ethics, professionalism, or positive contribution, and at no time did the clients or O'Quinn ever accuse Brown and Bain of a clear and serious violation of its duties to the client. These are words taken right out of the restatement, section 37, for forfeiture of fees. One other point I'd like to make about the withdrawal point. Restatement makes it clear it's a discretionary decision by the trial court. Remember that this district court, the court that decided the case that's now before this court, is the very same court in which the McIntyre v. Motorola litigation was pending. So what you have here is a district court making a doing what this court sees all the time, making a discretionary decision about an award of attorney's fees in a matter over which it had presided. Now, when this court sees those cases, typically there are disputes between clients about whether one should pay the other's fees as opposed to a dispute directly between the clients. But you mean lawyers? Between lawyers. Thank you, Your Honor. But it's clearly clear. Well, that's what's jarring about this case. We have 91 percent of the proceeds of the recovery goes to the lawyers, 9 percent goes to the clients, and we're seeing you folks fight about it. I mean, I must say, when you pick up the briefs, it's very jarring. Jarring is the reason. And you're seeking your bonus at the end of the day. I mean, I can understand why O'Quinn would be a little upset about it, not that I necessarily agree with their contract interpretation. Nothing that can happen in this case, Your Honor, will change the amount that went to the clients. This is strictly the dispute between lawyers, and O'Quinn is hardly offering to pay this money back to the clients. The contract is clear. I think it's entirely reasonable for Brown and Bain. What O'Quinn is trying to do is keep the money for itself. It's not offering to pay it to the clients. I agree. It's jarring that this got to this stage, because I think that the contract is clear, and all attempts by Brown and Bain to resolve the issue short of litigation were rebuffed. There's evidence in the record in connection with the attorney's fees application that when Brown and Bain tried to settle this matter with O'Quinn, they were basically told that they would get nothing and that, in fact, there would be a counterclaim. So it is unfortunate that we're here, but that's how we find ourselves. To get back to the abuse of discretion point, certainly, I think in order to accept O'Quinn's argument, this Court would have to find that it was an abuse of Judge Silver's discretion to decide that there was no misconduct in this record. I'm cognizant of the fact that I'm standing before law students who probably wish to hear argument, but unless the Court has further questions, I'd sit down. Roberts, Jr.: Any further questions? Thank you for your argument. We have some time for rebuttal. Yes, Your Honor. On the issue of whether the expenses that were brought up earlier were authorized or not, we've made the point, I thought, that they're not part of the appeal. And on page 26 of Brown and Bain's brief, Brown and Bain says, quote, Whether or not O'Quinn was or was not authorized to charge for these expenses is irrelevant to this appeal. So it seems that despite the insinuations that they're improper charges, something that could be brought up another day, that it's agreed upon for purposes of this appeal by both sides, that those are not actually relevant. Now, it's undisputed in this case that the O'Quinn firm lost $3 million in the end. No debate about it. They may at some point debate legitimacy of some expenses, yes, but that's not here today. The question, I think, goes back to the language. Roberts, Jr.: Counsel, this – the question – the assertion that the O'Quinn firm lost $3 million is based on that ER-49 that Judge Noonan referred you to at the top of your argument. But there's an item on there that hasn't been resolved. And I understand your opening point here on your rebuttal was these matters haven't been resolved because they really weren't relevant to the question of what was recovery. Yes, Your Honor. I believe that was your argument about why you couldn't identify for sure what all of these things were. But there is a line here on this that does award $4.5 million in office salaries for your Phoenix office. Now, you told us, again, without any support of any findings of fact by the judge, that that's $4.5 million in – that's a lot of paralegals. Yes, Your Honor. There were a lot of paralegals. There's a building full of paralegals. Brown and Bain put in 26,000 hours, including all the attorneys, and only came up with $2.9 million. You came up with $4.5 and claim that there's no – there are no attorney's fees in that figure? I don't believe there are, Your Honor. But again, I would have to have that thing litigated. But this is – if we thought that was relevant, that is a point on which we would need to return this to the district court for findings. I agree with you, Your Honor, that any sensible person litigating this case to that issue would go into the accountability for all of those expenses. Well, sure. But as you look at the paralegal expenses, it appeared to me, and I may be wrong, that those were the paralegal expenses that you charged, not the salaries that you paid. Is that so? I can't tell you one way or another, Your Honor. All I have is the same record. And when you charge paralegal salaries, you're building a profit margin over the salaries the paralegals make, right? Your Honor, I can't testify about what the practice of the law firm is in other  All I can tell you is what the record shows here. The bottom line is that the $3 million loss has a figure in there of $4.5 million that went to people working at OQUIP. We didn't fail to make payroll at OQUIP, right? As far as I know, we've never failed to make a payroll, Your Honor. And I knew I shouldn't have gone into this issue on rebuttal. It violates everything I used to teach when I taught at Charlotte Acres. I just can't leave it alone. Well, you have about a minute left. What would you like to – The last thing I'd like to say, Your Honor, is that what we started with is what we should end with, and that is the words of the contract. The trial court, the district court, thought there was only one way to read the contract. Our position is that there's more than one way. It keys on two words, really, not just the word recovery, but also the word proceeds. And our position is that you don't have proceeds if you wind up losing money. Now, we're not talking about proceeds to the clients. We're talking about proceeds to the attorneys. That's what the contract is about. And we also take the position that you don't have a recovery if you wind up losing money. Now, true, that is not specifically said in the contract, but it's a reasonable interpretation of what the parties must have had in mind when they wrote the contract. And when Brown and Bain walked away from the case three years before it was over, the idea that they even then thought that they were going to get a bonus is fantastical. I submit that they walked away – Well, they had a discounted fee to begin with. So it's not entirely a fantastic notion that they would get a bonus at the end. I mean, that was – they didn't get a full reimbursement for their fees at the onset. I'll retract fantastic and substitute improbable. Okay. As to be less argumentative about it. But they did get fees. Certainly, they got $3 million in fees. Yes. And for them to expect a bonus, our position is unreasonable. And the Court, under Arizona law, should interpret the contract in a way that is fair and reasonable. Thank you, counsel. Thank you both for your arguments this morning. The case, as heard, will be submitted for decision.
judges: Noonan, Thomas, Bybee